*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0293p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

J.L. SPOONS, INC.,

     *Plaintiff-Appellee,*

  *v.*

NANCY J. DRAGANI, Acting-Director, Ohio
Department of Safety, et al.,

     *Defendants-Appellants.*

No. 07-3178

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 04-00314—Ann Aldrich, District Judge.

Argued: March 18, 2008

Decided and Filed: August 15, 2008

Before: RYAN, SILER, and COLE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Robert J. Krummen, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus,
Ohio, for Appellants. J. Michael Murray, BERKMAN, GORDON, MURRAY & DeVAN,
Cleveland, Ohio, for Appellee. **ON BRIEF:** Robert J. Krummen, William P. Marshall, Charles E.
Febus, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. J.
Michael Murray, BERKMAN, GORDON, MURRAY & DeVAN, Cleveland, Ohio, for Appellee.

   SILER, J., delivered the opinion of the court, in which RYAN, J., joined. COLE, J. (pp. 8-
14), delivered a separate dissenting opinion.

---

**OPINION**

---

   SILER, Circuit Judge. Plaintiffs, a group of strip club owners in Ohio, challenged Ohio
Liquor Control Commission Rule 52 on First Amendment grounds. Enacted in 2004, Rule 52
provided that an establishment holding a liquor permit may not knowingly or willfully allow nudity
or sexual activity on its premises. The district court granted plaintiffs a temporary injunction against
enforcement of Rule 52. Later, it declared that parts of Rule 52 were unconstitutionally overbroad
and it permanently enjoined their enforcement anywhere in Ohio. Defendants now appeal, arguing
that Rule 52 is constitutional. We hold that Rule 52 is not overbroad and we REVERSE.

1

BACKGROUND

The strip club owners challenge §§ (A)(2), (B)(2), and (B)(3) of revised Rule 52. The challenged sections read as follows:

(A) Definitions as used in this rule:
(2) "Nudity" means the showing of the human male or female genital, pubic area or buttocks with less than a fully opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple and/or areola; the exposure of any device, costume, or covering which gives the appearance of or simulates the genitals, pubic hair, natal cleft, perineum, anal region, or pubic hair region; or the exposure of any device worn as a cover over the nipples and/or areola of the female breast, which device simulates and gives the realistic appearance of the nipples and/or areola.
(B) Prohibited activities: no permit holder, his agent, or employee shall knowingly or willfully allow in and upon his licensed permit premises any persons to:
(2) Appear in a state of nudity;
(3) Engage in sexual activity as said term is defined in ORC Chapter 2907.

Sexual activity means "sexual conduct or sexual contact, or both." ORC Chapter 2907. The Ohio Revised Code defines "sexual conduct" as:

vaginal intercourse between a male and female, anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

"Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." ORC Chapter 2907.

In July 2000, the district court permanently enjoined enforcement of several sections of old Rule 52[1], finding them invalid under the First and Fourteenth Amendments. As a result, the Ohio Liquor Control Commission ("the Commission") commenced proceedings for the enactment of a new version of Rule 52. In September 2003, the Commission received evidence and testimony regarding the validity of proposed new language for Rule 52. At this hearing, Mark Anderson, Executive Director of the Commission, testified that the earlier version of Rule 52 had been rescinded and that all of the filing requirements imposed by state law for the new version of Rule 52 had been met.

The Commission heard extensive testimony from Bruce Taylor, an attorney from Fairfax, Virginia. Throughout his career he prosecuted vice crimes, including obscenity, prostitution, and liquor violations. He spoke at length about his understanding of precedent in this area and the constitutionality of liquor regulations. He testified that "nude dancing does contribute to its own types of secondary effects and to a greater degree than other liquor bars that don't have nude dancing." Specifically, prostitution, drug trafficking, and fights occur more frequently in and around bars that allow nude dancing than those that do not permit nude dancing. Taylor expressed his

---

[1]The primary difference between the old and the new Rule 52 is that the old Rule 52 covered the showing of electronically reproduced images depicting actual or simulated sexual activities.

opinion that the language under consideration for the new Rule 52 would be held constitutional by the courts.

The new version of Rule 52 was finalized and filed on February 9, 2004. It was scheduled to take effect on February 20, 2004. On February 20, the strip club owners filed suit after learning of plans for enforcement agents to investigate strip clubs to determine compliance with Rule 52. They claimed that the Rule 52 provisions concerning "nudity" and "sexual activity" were broadly restrictive of protected expression. They sought a declaratory judgment that these sections were unconstitutional and a permanent injunction barring their enforcement. The district court granted the request for a temporary restraining order and scheduled a preliminary injunction hearing.

At the preliminary injunction hearing, the plaintiffs called Dr. Judith Hanna, Ph.D., a cultural anthropologist and sociologist who researches and writes about arts, dance, and society. She stated that exotic and erotic dance has artistic value and conveys a range of potential messages. She also discussed a variety of "mainstream" ballet, modern dance, and theater performances that allegedly involve types of nudity and sexual contact that could be prohibited by Rule 52. The club owners also presented testimony from Dr. Daniel Linz, Ph.D., a sociologist and psychologist, who stated that his research showed no positive correlation between the presence of liquor-serving establishments featuring nude or semi-nude dancing and the types of crimes cited by the Commission in support of its decision to adopt Rule 52. Dr. Linz stated that in some cases there was a negative correlation, meaning that nude dancing establishments actually decreased crime in the surrounding community.

The Commission then presented testimony from Scott Pohlman of the Ohio Department of Safety in support of Rule 52. He described numerous occasions where he personally observed illicit behavior in and around liquor-serving establishments that feature nude or semi-nude dancing. He stated that Rule 52 was needed to limit illicit behavior.

Following the hearing, the Commission agreed to refrain from enforcing Rule 52 until at least April 1, 2004, in order to grant the district court enough time to enter a ruling on the strip club owners' motion for a preliminary injunction. On April 1, the district court granted plaintiffs' motion for a preliminary injunction against the Commission. It enjoined the defendants from enforcing §§ (A)(2), (B)(2), and (B)(3) anywhere in Ohio. In January 2007, it granted plaintiffs a permanent injunction and declared §§ (A)(2), (B)(2), and (B)(3) unconstitutionally overbroad. The district court concluded that it could not sever the unconstitutional language from the regulation because §§ (A)(2), (B)(2), and (B)(3) were overbroad.

## ANALYSIS

We review constitutional issues de novo. *Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005). We find that Rule 52 is a constitutional, content-neutral regulation of the undesirable secondary effects, including prostitution, drug trafficking, and assault, associated with nude dancing in an environment serving alcohol. It is not overbroad.

### *Pap's A.M.*

Rule 52 is almost identical to the regulation upheld by the Supreme Court in *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000). While *Pap's A.M.* involved a challenge on First Amendment freedom of expression grounds, not an overbreadth challenge, a discussion of *Pap's A.M.* is necessary. In *Pap's A.M.*, the United States Supreme Court upheld a regulation making it "a summary offense to knowingly or intentionally appear in public in a 'state of nudity.'" *Id.* at 283. The regulation had wording and definitions very similar to Rule 52.

The Court began its analysis by stating that while being "in a state of nudity" is not an inherently expressive condition, nude dancing is expressive conduct and it falls within "the outer ambit" of the First Amendment's protection. *Id*. at 289. To determine what level of scrutiny applies, a court must decide whether the state regulation is related to the suppression of expression. *Id*. If the governmental purpose is unrelated to suppression of expression, then the regulation must satisfy the less stringent standard from *United States v. O'Brien*, 391 U.S. 367, 377 (1968). *Id*. If, on the other hand, the government interest is related to the content of the expression, the regulation must be justified under a more demanding standard. *Id*.

The Court held that government restrictions on public nudity, such as the one passed by Erie, "should be evaluated under the framework set forth in *O'Brien* for content-neutral restrictions on symbolic speech." *Id*. If a law is a general prohibition on public nudity, then by its terms it regulates conduct alone, not speech. *Id*. at 289-90. The ordinance at issue did not attempt to regulate the primary effects of expression, i.e., the effect of the audience watching nude dancing, but rather the secondary effects that impact the public health, safety and welfare. *Id*.

The regulation must pass muster under the *O'Brien* standard: (1) the regulation must be within the constitutional power of the government to enact, (2) the regulation must further an important or substantial government interest, (3) the government interest must be unrelated to the suppression of free expression, and (4) the restriction must be no greater than essential to the furtherance of the government interest. *Id*. at 296, 301. The Erie regulation passed the *O'Brien* test. First, Erie's efforts to protect public health and safety were clearly within the police powers. *Id*. at 296. Second, the regulation furthered a substantial government interest because Erie found that "lewd, immoral activities carried on in public places for profit are highly detrimental to the public health, safety, and welfare, and lead to the debasement of both women and men, promote violence, public intoxication, prostitution and other serious criminal activity." *Id*. at 297 (quoting Erie's findings contained in Petition for Cert.). Erie did not need to carry out a study documenting these effects and it did not need to develop a specific evidentiary record to support its ordinance. *Id*. at 298. It is self-evident that strip clubs cause public health and safety problems. *Id*. at 300-01. Third, the government's interest in suppressing the negative secondary effects of strip clubs was unrelated to the suppression of free expression. *Id*. at 301. Finally, the restriction was no greater than was essential because it only had a de minimis impact on the expressive element of nude dancing. *Id*. The requirement that dancers wear pasties and G-strings is a minimal restriction that leaves ample capacity to convey the dancer's erotic message. *Id*.

### *Overbreadth*

*Pap's A.M.* would be directly on-point and would decide the issue were it not for the fact that the district court struck down Rule 52 on the grounds that it was overbroad, not that it violated the First Amendment guarantee of freedom of expression under *O'Brien*. *Pap's A.M.* did not address an overbreadth argument. *See* 529 U.S. at 286 (stating that lower court did not reach the overbreadth issue). The overbreadth doctrine prohibits the government from proscribing a "substantial" amount of constitutionally protected speech judged in relation to the statute's plainly legitimate sweep. *Virginia v. Hicks*, 539 U.S. 113, 118-119 (2003). A finding that a law is overbroad "suffices to invalidate all enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Id*. at 119 (internal quotations omitted). Overbreadth doctrine exists to allay the concern that the threat of enforcement of an overbroad law may deter or chill constitutionally protected speech—especially when the law provides criminal sanctions. *Id*. Many persons would refrain from engaging in constitutionally-protected speech rather than risk case-by-case litigation of their rights, putting them at substantial risk. *Id*. Thus the overbreadth doctrine exists to protect the marketplace of ideas and reduce the social costs of withheld speech. *Id*.

However, "there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting enforcement of that law." *Id*. This principle is especially important when a law reflects the legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. *Id*. Overbreadth doctrine creates substantial social costs when it blocks application of a law to constitutionally unprotected conduct. *Id*. "To ensure that these costs do not swallow the social benefits of declaring a law overbroad, [the Supreme Court has] insisted that a law's application to protected speech be substantial . . . relative to the scope of the law's plainly legitimate applications . . . before applying the strong medicine of overbreadth invalidation." *Id*. at 119-20 (internal quotations omitted). The overbreadth claimant bears the burden of demonstrating from the text of the law and from actual fact that substantial overbreadth exists. *Id*. at 122. We have emphasized that overbreadth doctrine is only to be used as a last resort. *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 300 (6th Cir. 2008).

The strip club owners cannot carry their burden to show that Rule 52 is substantially overbroad. Nude dancing is protected by the First Amendment, but it is within the "outer ambit" of the First Amendment's protection. *Pap's A.M.*, 529 U.S. at 289. Rule 52 has a minimal impact on the marketplace of ideas because persons desiring to perform mainstream works of art involving nudity and sexual activity may do so in an establishment that is not licensed to sell liquor. In the alternative, they may perform their works in an establishment licensed to sell liquor if they wear clothing or pasties and a G-string and avoid sexual conduct or sexual contact. Ohio narrowly defines sexual conduct to include vaginal intercourse, oral sex, and vaginal or anal penetration. The prohibition against sexual contact applies only if the purpose of the contact is to arouse sexually or to gratify either person. By its own terms, Rule 52 does not apply to contact done in furtherance of legitimate works of art for the purpose of conveying artistic meaning, such as the touching of an actor's thigh in a play. Thus, mainstream works of art that merely suggest sexual activity will not be burdened. Invalidating Rule 52 as overbroad would impose substantial societal costs because it would hamper Ohio's legitimate interest in curtailing the negative secondary effects, such as prostitution and drug trafficking, associated with an environment mixing alcohol with nudity and sexual activity. *See Hicks,* 539 U.S. at 119.

The district court concluded that "numerous examples of mainstream theater and dance which contain nudity and/or sexual contact," such as Oh! Calcutta!, would be prohibited by Rule 52. However, such productions may still be held in venues that do not have a liquor license, or by requiring the performers to wear pasties and a G-string and to avoid vaginal intercourse, oral sex, and vaginal or anal penetration. *See Pap's A.M.*, 529 U.S. at 301 ("The requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message"). While there may be legitimate artistic works that involve actors appearing in a state of nudity, "[b]eing in a state of nudity is not an inherently expressive condition" that is protected by the First Amendment. *Id*. at 289. Moreover, the First Amendment does not provide a right to engage in sexual activity in public. The effect of Rule 52 on legitimate artistic works is incidental and does not call for the "strong medicine" of overbreadth doctrine.

Furthermore, a law is not invalid simply because some impermissible applications are conceivable. *New York v. Ferber*, 458 U.S. 747, 772 (1982) (concluding that a New York statute prohibiting possession of child pornography was not overbroad); *see also Sensations, Inc.*, 526 F.3d at 300 (upholding regulation banning total nudity in sexually oriented businesses because there was no realistic danger that the statute would significantly compromise recognized First Amendment protections of parties not before the court). In *Ferber*, the Supreme Court upheld against an overbreadth challenge a statute criminalizing possession of child pornography even though it may have reached some protected expression, such as medical textbooks and artistic works. 458 U.S. at 773. The Court upheld the statute because it "seriously doubt[ed] . . . that these arguably impermissible applications of the statute amount to more than a tiny fraction of the materials within

the statute's reach." *Id*. Here, analogizing to *Ferber*, any arguably impermissible application of the statute to citizens engaged in artistic expression amounts to no more than a fraction of Rule 52's reach. Also, as in *Sensations*, there is no "realistic danger" that the regulation will "significantly compromise recognized First Amendment protections of parties not before the [c]ourt" because there is no constitutional right to appear in public in a state of nudity or engage in sexual intercourse in public. 526 F.3d at 300.

The district court relied heavily on *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129 (6th Cir. 1994), in striking down Rule 52 as overbroad. In *Triplett Grille*, we struck down as overbroad an Akron ordinance banning public nudity. The city's lawmakers testified that they enacted the provision because of constituents' moral outrage toward nude dancing. *Id*. at 131. No witness testified that the prevention of prostitution or other illegal activity was the ordinance's goal. *Id*. Instead, lawmakers passed the ordinance to establish "a community standard" even though Akron had never experienced any negative secondary effects commonly associated with nudity. *Id*. We struck down the ordinance as overbroad:

> Because the City has failed to demonstrate a link between nudity in *non-adult entertainment* and secondary effects, we do agree with the district court that the Akron ordinance must be struck down as facially unconstitutional under the First Amendment overbreadth doctrine.

*Id*. at 135 (emphasis added). The public indecency ordinance prohibited all public nudity, including live performances with serious literary, artistic, or political value. *Id*. at 136. Because the ordinance covered expressive conduct with literary and artistic value that is not generally associated with prostitution, sexual assault, or other crimes, it was overbroad. *Id*.

*Triplett Grille* is distinguishable from the situation presented here and does not control. First, in *Triplett Grille*, the city ordinance banned *all* public nudity in *all* public places. 40 F.3d at 131. However, Rule 52 bans public nudity only in establishments licensed to sell liquor. Therefore, Rule 52 is much less restrictive and covers much less speech than did the regulation at issue in *Triplett Grille*. Second, in *Triplett Grille*, the city enacted its ban because of constituents' moral outrage toward nude dancing, not concern over the negative secondary effects of nude dancing. *Id*. Here, however, the Commission enacted Rule 52 out of a concern over the negative secondary effects of nude dancing, not moral outrage. Moreover, the *Pap's A.M.* Court rejected Justice Souter's concurrence in *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 581 (1991) (Souter, J., concurring), upon which the *Triplett Grille* court exclusively relied, 40 F.3d at 136, and held that the proponent of a regulation did not need to carry out *any* study documenting secondary effects and it did not need to develop a specific evidentiary record to support its ordinance.[2] *Pap's A.M.*, 529 U.S. at 299-300 (rejecting Justice Souter's position that Erie should have conducted a study because negative secondary effects are amenable to empirical treatment). *Triplett Grille's* progeny are similarly distinguishable. *See, e.g.*, *Hamilton's Bogarts v. Michigan*, 501 F.3d 644 (6th Cir. 2007); *Odle v. Decatur County*, 421 F.3d 386 (6th Cir. 2005). Rule 52 is constitutional and the

---

[2]While *Barnes* involved a First Amendment freedom of expression challenge to a regulation, not an overbreadth challenge, 501 U.S. at 585 n.2, we nevertheless incorporated the reasoning of *Barnes* into our overbreadth analysis in *Triplett Grille*. 40 F.3d at 136. Applying the rule from *Marks v. United States*, 430 U.S. 188 (1977), that the opinion of the Justice concurring in the judgment on the narrowest grounds should be considered the Court's opinion, the *Triplett Grille* court relied on Justice Souter's concurring opinion in *Barnes* for its holding. 40 F.3d at 133-36. Like *Barnes*, *Pap's A.M.* resulted in a plurality opinion on the merits of the case, although a majority of the Justices concluded that the case was not moot. 529 U.S. at 282-83. Applying the *Marks* doctrine, we conclude that Justice O'Connor's opinion is the Court's opinion because it was the narrowest opinion concurring in the judgment. Justice Scalia's concurring opinion, in which Justice Thomas joined, concluded that the case was moot and is therefore not the narrowest opinion concurring in the judgment. *Id*. at 302 (Scalia, J., concurring). Thus, *Pap's A.M.* modified *Barnes*, which underpinned our reasoning in *Triplett Grille*.

Commission was not required to study the application of the ordinance to non-adult or "high-culture" theater.

REVERSED.

———————————

## DISSENT

———————————

COLE, Circuit Judge, dissenting. The Ohio Liquor Control Commission ("Commission") enacted Ohio Administrative Code § 4301:1-1-52 ("Rule 52") in order to fight the negative secondary effects resulting from the combination of liquor and nudity or sexual activity at nude-dancing establishments. But instead of limiting the reach of Rule 52 to those establishments, the Commission chose to "burn the house to roast the pig," *Butler v. Michigan*, 352 U.S. 380, 383 (1957), by applying Rule 52 to all 25,000 liquor permit holders in the state of Ohio, and by failing to exempt persons engaging in performances with literary, artistic, or political value. Because I believe that Rule 52 is not reasonably restricted to its intended purpose and thus unconstitutionally overbroad, I respectfully dissent.

First things first. My colleagues and I agree on at least one significant matter—*City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000), has no bearing on this case. In *Pap's A.M.*, the Supreme Court considered an ordinance enacted by the City of Erie, Pennsylvania, making it an offense to knowingly or intentionally appear in public in a "state of nudity." While a plurality of the Court ultimately reversed the Pennsylvania Supreme Court's decision to enjoin the statute, concluding that the ordinance satisfied the four-part test established in *United States v. O'Brien*, 391 U.S. 367 (1968), the Court did not reach the question of the law's overbreadth. *See Pap's A.M.*, 529 U.S. at 286. As the majority recognizes, this distinction is significant because there is little question, nor do the plaintiffs even dispute, that Rule 52 *as applied* to nude-dancing establishments would be constitutional. *See id.* at 296-302. But the question on appeal—indeed, the *only* question before us—is whether Rule 52, as written, unnecessarily infringes upon First Amendment freedoms outside of the permissible regulation of nude-dancing establishments.

The answer to this question is where we respectfully part ways. I acknowledge that the overbreadth doctrine should be considered "strong medicine" to be used "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). But when a law criminalizes a "substantial" amount of protected speech, "judged in relation to the statute's plainly legitimate sweep," *id.* at 615, we must enjoin the enforcement of the law, "until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression," *id.* at 613. This longstanding rule is rooted in the "assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* at 612. *See also Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 274 F.3d 377, 387 (6th Cir. 2001). With that in mind, I see three main problems with Rule 52.

**1. Rule 52 applies to substantially more venues than necessary.** By issuing Rule 52, the Commission intended to address the "undesirable secondary effects throughout the state of Ohio of sexually oriented or adult businesses where alcohol was served"—namely, the increased presence of drugs, prostitution, underage drinking, and inappropriate physical contact between dancers and patrons, including assault. (Joint Appendix ("JA") 302-03.) But instead of being limited to those establishments, Rule 52 applies to all 25,000 privately owned and operated manufacturers, distributors, and retailers of alcoholic beverages in the state of Ohio. *See* Dep't of Liquor Control 2007 Annual Report, at 11, *available at* http://www.com.ohio.gov/liqr/docs/liqr_2007AnnualReport.pdf.

Of those 25,000 permit holders, about half are carry-out retail stores, and about half are establishments that could potentially present live entertainment. Of those approximately 12,500 venues that could potentially present live entertainment, only 200 or so are venues which currently

feature nude or semi-nude dancing. (JA 265, 283.) That means that about 12,300—or 98.4 percent—of alcohol permit holders in Ohio that potentially present live entertainment are needlessly required to conform to Rule 52's mandates.

To illustrate the staggering breadth of Rule 52's application, here is a sampling of the venues affected: bars, restaurants, nightclubs, hotels, country clubs, convention centers, theaters, stadiums, comedy clubs, concert halls, playhouses, ballet houses, and museums. In fact, the following venues in Cleveland *alone* are subject to the Rule: the Amphitheater at Tower City, the Cleveland Museum of Arts, the Cleveland Agora Theater and Ballroom, the Great Lakes Science Center, the Beachland Ballroom, the Cleveland Play House Club, Jacobs Field, Gund Arena, the Cleveland Convention Center, the Nautica Pavilion, the State Theater, the Playhouse Square Foundation, the Allen Theatre at Playhouse Square, and Severance Hall. None of those venues have been identified by the Commission as places where illegal narcotics are taken or distributed, and none are places where prostitution is a recurring problem. But they are, however, places where constitutionally protected speech might be prevented. This brings me to my second concern.

**2. Rule 52 affects a substantial number of artistic performances protected by the First Amendment.** Rule 52 prohibits any "permit holder, his agent, or employee [from] knowingly or willfully allow[ing] in and upon his licensed permit premises any persons to: . . . (2) Appear in a state of nudity; (3) Engage in sexual activity as said term is defined in Chapter 2907 of the Revised Code." Ohio Admin. Code § 4301:1-1-52(B). "Sexual activity," in turn, is defined as "sexual conduct or sexual contact, or both." Ohio Rev. Code § 2907.01(C).

There are two provisions that I find particularly troubling. First, "nudity" includes not only the showing of male or female genitalia, pubic area or buttocks, or the female breast "with less than a fully opaque covering," but also "the exposure of any device, costume, or covering which gives the *appearance of or simulates*" those body parts. Ohio Admin. Code § 4301:1-1-52(A)(2) (emphasis added). So Rule 52 criminalizes any performance, whether a play, ballet, or musical, which contains a fleeting scene involving the exposure of a female breast, even if a performer wears a nudity-simulating device or costume giving the appearance of a female breast.

Second, "sexual contact" is defined as "any touching of an erogenous zone of another, including *without limitation* the thigh, genitals, buttock, pubic region, or, if the person is female, a breast, for the purpose of sexually arousing or gratifying either person." Ohio Rev. Code § 2907.01(B) (emphasis added). This carries a risk of enforcement against a variety of ballet and dance performances, in which choreographers frequently require participants to "touch" the "erogenous zones" of one another for the purpose of conveying a sexual message.

Together, these two provisions prohibit on licensed premises any live entertainment that contains even a brief scene involving simulated nudity or the touching of any erogenous zone, even if the nudity or touching is integral to the narrative of the performance, and even if alcoholic beverages are not being served during the actual performance. To name but just a few examples: the buttocks of the dancing murderesses in *Chicago*, the jarring depiction of incest in the dance *Big Bertha*, the rebellious nudity of the performers in *Hair* depicting the counter-culture of the 1960s, the nudity of a woman staging a poetic battle as she dies of ovarian cancer in the Pulitzer Prize-winning drama *Wit*, the dramatic portrayal of sexual assault in *A Streetcar Named Desire*, and the nudity of a young man suffering from a psychological condition in *Equus*, recently popularized by Daniel Radcliffe (more commonly known for his role as Harry Potter). Whatever one might think of these performances—and we could disagree for years as to whether they should be considered mainstream, independent, subversive, or some combination of the three—it simply does not matter: in the eyes of the First Amendment, they are no less valuable than the famous works by Shakespeare or Arthur Miller.

In short, Rule 52 does not apply only to nude dancing, which "falls only within the outer ambit of the First Amendment's protection," *Pap's A.M.*, 529 U.S. at 289, but also to a variety of "live entertainment, such as musical and dramatic works," *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981), that are entitled to the full protection of the First Amendment. *See also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 603 ("Put differently, art is entitled to full protection because our 'cultural life,' just like our native politics, 'rest[s] upon [the] ideal' of governmental viewpoint neutrality.") (citation omitted, alterations in original). This is true even if those performances contain nudity or other sexual elements that some citizens might find offensive, *see Reno v. ACLU*, 521 U.S. 844, 874 (1997), which brings me to my final concern.

**3. Rule 52 does not offer any limiting construction.** As part of our analysis, we must "consider any limiting construction that a state court or enforcement agency has proffered," *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982), that can save an otherwise unconstitutional statute by eliminating the statute's substantial overbreadth, *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). If a statute is "readily susceptible" to a limiting interpretation that would make it constitutional, the statute must be upheld, but "we will not rewrite a state law to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988).

The Commission concedes that Rule 52 is not readily susceptible of any construction that would exempt persons engaging in performances that have literary, artistic, or political value, because it has no discretion in "pick[ing] and choos[ing] which permit holders" are subject to Rule 52's requirements, and is duty-bound "to enforce it evenly and equally against all permit holders in the state of Ohio." (JA 254.) In fact, the only reason advanced by the Commission for not excluding "legitimate high culture theater," is because it would be impossible to "have a rule that would make sense if you went through and tried to have exceptions for all sorts of things." (JA 290-91.)

The majority attempts to sidestep this issue by noting that "such productions may still be held . . . by requiring the performers to wear pasties and a G-string." Maj. Op. 5. But *Pap's A.M.*, upon which my colleagues rely for this proposition, held only that the nude dancers at *nude-dancing establishments* may be required to wear these devices because they are "a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message." 529 U.S. at 301. No court, to my knowledge, has ever held that a state may require "pasties" or "G-strings" for performances with serious artistic or literary value, particularly when the state fails to assert a single interest for such a requirement.

More to the point, Rule 52 prohibits not only actual nudity, but also "the exposure of any device, costume, or covering which gives the appearance of or simulates" nudity, Ohio Admin. Code § 4301:1-1-52(A)(2), which would almost certainly include both the use of "pasties" or a "G-string." The result, according to the testimony of John Duvall, the then-Deputy Director of the Ohio Department of Public Safety, is that a venue reading the plain language of Rule 52 "would [] discover that the language of the rule forbids it from presenting an artistic performance that has a fleeting scene involving the exposure of a woman's areola and nipple." (JA 354.) If those venues "wanted to be safe," Duvall opined, "they would refrain from presenting that particular performance [at all]." (*Id.*)

The same can be said of the provision prohibiting "sexual contact." While "sexual contact" is limited to "touching . . . for the purpose of sexually arousing or gratifying either person," Ohio Rev. Code § 2907.01(B), there are a large number of contexts in which performers undertaking constitutionally protected forms of expression might seek to convey a message with a sexual

component.[1]   At the very least, there is a high probability Rule 52 would be interpreted as prohibiting the kinds of touching that commonly occurs in ballets, plays, or musicals.  When Duvall was asked whether those venues "would know they better not present the performance that would be so interpreted or else they risk the possibility that they could be punished," he admitted that they should not.  (JA 355.)

True, as the majority points out, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).  But this does not mean the speech must be presently ongoing.  Because the overbreadth doctrine is designed "to prevent the *chilling* of *future* protected expression," *Staley v. Jones*, 239 F.3d 769, 779 (6th Cir. 2001) (emphasis added), whether such performances have been put on in the past, or whether there are plans to do so in the future, is irrelevant.  *See Odle v. Decatur County*, 421 F.3d 386, 397 (6th Cir. 2005) ("[N]either proof that an ordinance as currently applied has no unconstitutional effect, nor assurances offered by the relevant local authorities that the ordinance will not be put to such an effect in the future, constitute 'constructions' of the ordinance, as that term is ordinarily understood.").  In any event, the Commission can hardly say that the application of Rule 52 to serious theatrical performances is merely hypothetical, since it actually issued a citation against the production of *Oh! Calcutta!* in the past.  (JA 246, 290.)

Perhaps most importantly, even if one believes that the impact on these performances will be minimal, or that the state's interest in preventing prostitution or distribution of illegal narcotics is especially worthwhile, it is worth reemphasizing that Rule 52 burdens these performances without any justification.  Much of the Commission's argument focuses on the relative insignificance of the affected speech.  I admit that *Hair* may not be "substantial" judged in relation to the entire spectrum of protected activities under the First Amendment.  But the overbreadth doctrine, limited as it may be, requires us to judge Rule 52 "in relation to [its] plainly legitimate sweep." *Broadrick*, 413 U.S. at 615.  With respect to nude or topless dancing at clubs or bars, an interest in limiting the harmful secondary effects may justify the challenged provisions.  With respect to ordinary theater and ballet performances, concerts, and other artistic forms of entertainment, however, the Commission provides "no evidence, no judicial opinion, and not even any argument [] to suggest that these mainstream entertainments, to which it has conceded the restrictions apply, produce the kind of adverse secondary effects that the state seeks to prevent." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 516 (4th Cir. 2002).  Because Rule 52's "plainly legitimate sweep" is extraordinarily narrow compared to the breadth of the rule, it criminalizes substantially more speech than constitutionally permissible.

The foregoing observations are, in my view, sufficient to resolve the issue before us.  But I will add one more: *Odle*, 421 F.3d 386, controls the outcome of this case.  In *Odle*, we invalidated a county "ordinance prohibit[ing], among other things, nudity and the performance of a wide range of arguably sexually suggestive acts in 'public place[s] where intoxicating liquors [] are offered for sale, served or consumed," *id.* at 392 (citation omitted, alteration in original), as unconstitutionally overbroad, because it "'ma[de] no attempt to regulate only those expressive activities associated with [the targeted] harmful secondary effects,'" *id.* at 399 (quoting *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 136 (6th Cir. 1994)).

Like Rule 52, the ordinance in *Odle* did not apply to every public venue, but instead only to venues that sold or served alcohol. *Id.* at 388.  Like Rule 52, the ordinance prohibited entertainment

---

[1]It is also troubling that the prohibition on "sexual contact" applies to patrons as well as employees.  Under Rule 52, a bar owner who witnesses a customer flirtatiously touching another customer, on any potentially "erogenous" part of the body, including "the thigh," must take affirmative steps to end this conduct, or risk a citation from the Commission.

in which a performer "expose[s] . . . that area of the human breast at or below the top of the areola, . . . his or her genitals, pubic area, buttocks, anus or anal cleft or cleavage," or"give[s] the appearance of or simulate[s]" those parts of the body. *Id.* at 394. And like Rule 52, the ordinance prohibited "performance of acts or simulated acts" of certain physical contact in dramatic scenes or dances that communicated messages of eroticism or sexuality. *Id.*

Acknowledging that other courts have upheld statutes and ordinances banning nudity or sexually suggestive conduct in a wide range of public places, we found "crucial" the fact that the state liquor commission had produced no evidence that liquor-licensed establishments in general, as opposed to those particular establishments that regularly present nude or semi-nude dancing, caused the harmful effects of combining alcohol and nudity. *Id.* at 395-96. And because the ordinance in *Odle* contained no exemptions for artistic or theatrical performance, "it reache[d] a wide swath of public places," *id.* at 395, and would therefore prohibit a "myriad [of] performances that involve nudity or sexually suggestive content but to which the alleged harmful secondary effects that purportedly motivated the passage of the ordinance do not attend," *id* at 393. *See also Triplett Grille*, 40 F.3d at 136 (striking down a public indecency ordinance as overbroad because the law prohibited "all public nudity, including live performances with serious literary, artistic, or political value," which swept "within its ambit expressive conduct not generally associated with prostitution, sexual assault, or other crimes").

My colleagues' attempt to distinguish *Odle* falls short. To the best I can tell, *Odle* is arguably different only in that (1) the ordinance applied to all public places and (2) the county enacted the ordinance because of a moral opposition to nude dancing.

As to the first, the ordinance in *Odle* applied to all public places where intoxicating liquors were offered for sale, served, or consumed, whereas Rule 52 applies to all alcohol permit holders, their agents, or employees. Although the ordinance in *Odle* defined "public places" broadly, 421 F.3d at 392 n.7, the alcohol limitation would seem to render the ordinance's reach to exactly the same places as Rule 52—namely, to venues with an alcohol permit. But even if it is true that the ordinance in *Odle* applies to certain places where Rule 52 does not, the *Odle* court primarily focused on the chilling of expressive performances involving nudity or sexually suggestive acts in mainstream theaters, the very same performances that I am concerned about today. *Id.* at 395-96.[2]

I find the latter distinction even less persuasive, because the question before us is not whether Rule 52 is constitutional as applied to nude-dancing establishments. So for whatever reason the county in *Odle* enacted the ordinance—whether it be on moral grounds or to reduce prostitution—we can assume that the county had a legitimate justification. That, of course, is irrelevant to the question of whether the ordinance sweeps within its reach a broad swath of expressive conduct not associated with the county's identified undesirable secondary effects.[3]

---

[2] *Odle* "[left] for another day the question whether strict scrutiny ought to apply to an ordinance that prohibits not only nudity but also sexually suggestive acts performed while clothed," and concluded that "intermediate scrutiny requires (at least) proof that most establishments to which the challenged ordinance or statute applies are likely to spawn harmful secondary effects if permitted to hold performances involving nudity and/or content that could reasonably be viewed as sexually suggestive." 421 F.3d at 394. Because I believe that Rule 52 similarly "'reaches a substantial number of impermissible applications' relative to [its] legitimate sweep," *Deja Vu*, 274 F.3d at 387 (quoting *New York v. Ferber*, 458 U.S. 747, 771 (1982)), I also see no need to address this question.

[3] I am uncertain how Justice Souter's concurring opinion in *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 581 (1991), which involved an as-applied, not a facial overbreadth, challenge, is relevant to this analysis. Maj Op. at 6. Even if a proponent of a regulation does not need to develop a specific evidentiary record to support its ordinance, this conclusion does not remove the requirement that a statute must not criminalize a "substantial" amount of protected speech in comparison to the "statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615. The Commission may not need to develop an evidentiary record to show that the combination of alcohol and nude-dancing establishments

Our recent decision in *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291 (6th Cir. 2008), does not change this analysis. *Sensations* involved the constitutionality of a municipal ordinance "banning total nudity in sexually oriented businesses," which, unlike Rule 52 and the ordinance in *Odle*, involved a "far narrower [regulation] than . . . [one] applicable to the general public." *Id.* at 300. In fact, *Sensations* demonstrates what I have been saying all along: that had the Commission applied Rule 52 solely to nude-dancing establishments, the only establishments where the undesirable secondary effects from combining nudity and alcohol have been identified, this would be a significantly different case.

The vast majority of our sister circuits, moreover, share this view. *See Conchatta, Inc. v. Miller*, 458 F.3d 258, 266 (3d Cir. 2006) (invalidating as overbroad a liquor regulation that prohibited "any lewd, immoral or improper entertainment," because the regulation has a "chilling effect on a wide range of . . . artistic, theatrical, and other non-adult entertainment venues"); *Carandola*, 303 F.3d 507 (4th Cir. 2002) (finding a liquor regulation prohibiting any entertainment that "simulates sexual intercourse or any other sexual act" as overbroad, because "the Commission has offered nothing . . . to suggest that these mainstream entertainments . . . produce the kind of adverse secondary effects that the state seeks to prevent"); *Ways v. City of Lincoln*, 274 F.3d 514, 519 (8th Cir. 2001) (striking down a liquor regulation that prohibited "sexual contact," because the ordinance "did not contain any exception for artistic venues").

When our sister circuits have upheld such statutes against overbreadth challenges, those statutes have specifically exempted those performances I speak of. *See Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1083-84 (4th Cir. 2006) (finding a similar statute not overbroad because it exempted "theaters, concert halls, art centers, museums, or similar establishments"); *Farkas v. Miller*, 151 F.3d 900, 905 (8th Cir. 1998) (upholding an application of a public nudity statute because the statute included an exception for "a theater, concert hall, art center, museum, or similar establishment . . . primarily devoted to the arts or theatrical performances"); *J&B Entm't v. City of Jackson, Mississippi*, 152 F.3d 362, 366-67 (5th Cir. 1998) (exempting persons "engaged in expressing a matter of serious literary, artistic, scientific or political value").[4] By holding otherwise, the majority has set itself apart from nearly every other court to consider an overbreadth challenge to a similar statute or regulation.

The Commission reminds us time and time again that the state has a strong interest in regulating the negative secondary effects associated with nudity and sexual activity in nude-dancing establishments. I don't have any problem with that. But the state's interest in regulating those effects does not explain its interest in stopping a playhouse with an alcohol permit from presenting a ballet with a brief scene simulating nudity. Maybe there is some negative effect that I am unaware of, or maybe the Commission has some special insight in this area. Whatever the reason, no one—not the district court, not the majority, and certainly not the Commission—has brought such an interest to our attention.

When the government restricts constitutionally protected speech for some legitimate purpose unrelated to the content of the speech in question, we pause for concern. *See Pap's A.M.*, 529 U.S. at 289 ("If the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy the 'less stringent' standard from *O'Brien* for

---

produce undesirable secondary effects, but it must not criminalize protected speech (in this case, a performance with serious artistic or literary value) that has absolutely no relationship to the identified harms.

[4] The trio of cases upon which the Commission relies—*Sammy's of Mobile, Ltd. v. City of Mobile*, 140 F.3d 993 (11th Cir. 1998); *Ben's Bar, Inc. v. Vill. of Somerset*, 316 F.3d 702 (7th Cir. 2003); and *BZAPS, Inc. v. City of Mankato*, 268 F.3d 603 (8th Cir. 2001)—miss the boat. All three address the question of whether a similar regulation would be constitutional as applied to nude-dancing establishments, but none involve an overbreadth challenge.

evaluating restrictions on symbolic speech."). When the government restricts constitutionally protected speech for some legitimate purpose relating to the content of the speech, we give it our full attention. *See id.* ("If the government interest is related to the content of the expression, however, then the regulation falls outside the scope of the *O'Brien* test and must be justified under a more demanding standard."). But when the government restricts constitutionally protected speech without any justification whatsoever, loud alarm bells should sound off in our heads. Because I see Rule 52 as a regulation that fits squarely into this last category, I respectfully dissent.